**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0007n.06
Filed: January 5, 2007

No. 05-1556

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT KNICKERBOCKER, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| HUGH WOLFENBARGER, Warden, | ) | |
| | ) | **O P I N I O N** |
| **Respondent-Appellee.** | ) | |
| _____ | ) | |

Before: MERRITT and MOORE, Circuit Judges; COLLIER,[*] District Judge.

**KAREN NELSON MOORE, Circuit Judge.** Petitioner-Appellant Robert Knickerbocker ("Knickerbocker") appeals from the district court's order denying his petition for a writ of habeas corpus. The district court denied Knickerbocker's two habeas claims based on newly discovered evidence and dismissed the remaining four claims as untimely filed. The district court granted a certificate of appealability only as to the latter four claims. Knickerbocker argues that the statute of limitations should be equitably tolled as to those four claims because he has made a sufficient showing of actual innocence based on newly discovered evidence. Because Knickerbocker has not shown that it is more likely than not that no reasonable juror would find him guilty beyond a

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

reasonable doubt, we do not apply the equitable-tolling doctrine, and we **AFFIRM** the judgment of the district court dismissing the claims as time-barred.

## I. BACKGROUND

### A. Facts

On Sunday, August 26, 1990, Larry Hardyniec ("Hardyniec") visited the home of Joe Melton ("Melton") and Harry Camp ("Camp"). Melton paid Hardyniec $500 for marijuana, and Hardyniec arranged to meet Melton the next evening, August 27, ostensibly in order to arrange for a friend of his to sell Melton two pounds of marijuana for $4,000. Petitioner Robert Knickerbocker and Hardyniec planned instead to steal Melton's $4,000; Knickerbocker was to act as if he were taking Melton's money to a house to buy marijuana, but never return.

On the evening of August 27, Knickerbocker was at home. Hardyniec arrived, and Knickerbocker and Hardyniec left in Hardyniec's girlfriend's car. Meanwhile, Melton was at home and had prepared $4,000. Hardyniec called to ask if Melton was ready and told Melton that he would arrive shortly. When Hardyniec and Knickerbocker arrived at Melton's home, Hardyniec went inside. Soon after, Hardyniec and Melton came back outside, got in the car, and the three of them drove away.

Melton was killed, although there is some dispute over the circumstances. In his statement to the police, Knickerbocker said that he was driving and that from the back seat, Hardyniec wrapped a red wire around Melton's neck and choked him. Knickerbocker tried to stop Hardyniec, hitting Hardyniec with his casted right forearm, and Hardyniec stuck a knife in Knickerbocker's cast. Knickerbocker stopped the car, jumped out, and ran off. Evidence was also introduced before

2

Knickerbocker's jury, however, that Hardyniec was the driver and Knickerbocker was in the back seat. Hardyniec told his brother, Marvin Valdez ("Valdez"), that Knickerbocker killed Melton.

Knickerbocker went home and changed clothes, and his brother did not notice anything out of the ordinary. Hardyniec arrived at Knickerbocker's home soon after, and the two of them drove to Hardyniec's home. Knickerbocker told the police that Hardyniec threatened him and told him to keep his mouth shut.

Hardyniec's girlfriend, Tracy Burk ("Burk"), awoke to hear Knickerbocker and Hardyniec talking in the driveway at Hardyniec's home. Knickerbocker asked her if she would give him a ride, and she agreed after Hardyniec told her, "Sure, go ahead. Just hurry up." District Court Docket Entry 19 ("R.19") at 115-16 (Burk Test.). Burk drove Knickerbocker to a friend's home, then to the gas station, and finally dropped him off at another friend's home. Later that evening, Knickerbocker went to a bar with friends.

Burk, Valdez, and Valdez's girlfriend, Sharon Mitchell ("Mitchell"), noticed that Hardyniec was perspiring heavily and appeared upset when he returned home. Hardyniec was crying and, according to Valdez, said, "We killed Joe," and then soon after, said, "Did you ever see a man's throat cut wide open? I couldn't, I couldn't believe what Bobby did." R.20 at 84-85 (Marvin Valdez Test.).

Melton's body was discovered in the driveway of a local cleaners the next morning. Melton had marks encircling his neck consistent with strangulation with a wire, cuts and bruises to his face, and a seven-inch open cut to his neck. The medical examiner determined that Melton died of strangulation and received the cut to his neck post mortem.

3

Two days after the incident, on August 29, 1990, the police searched Knickerbocker's home pursuant to a valid search warrant. Among other items, police recovered a piece of red wire consistent with Melton's injuries. The police arrested Knickerbocker that same day. Knickerbocker agreed to give a statement to the police, in which he disclaimed any knowledge of a plan to rob Melton, gave a detailed account of Hardyniec killing Melton and Knickerbocker's own efforts to stop Hardyniec, and told the police that Hardyniec had been calling and threatening him during the previous two days. After Knickerbocker had given his statement, Sergeant Gary Tomkiewicz told him that Hardyniec had been in custody since the previous day and had no phone privileges, and thus Knickerbocker was apparently lying about receiving threats. Knickerbocker began rocking in his chair, sweating, and shaking. Sergeant Tomkiewicz also told Knickerbocker, falsely, that a witness had told them that Hardyniec was driving the car when Knickerbocker and Hardyniec left Knickerbocker's home. Knickerbocker then told the police that he had forgotten to tell them that he and Hardyniec had stopped and switched drivers because Hardyniec had a suspended license.

## B. Procedural History

Knickerbocker and Hardyniec were tried in a joint trial before separate juries. Knickerbocker was convicted of first degree felony murder and armed robbery.[1] Knickerbocker moved for a directed verdict and a new trial, which the trial court denied. The trial court sentenced him to mandatory life in prison for first degree felony murder and 50-90 years in prison for armed robbery, but vacated the armed robbery sentence to avoid potential double jeopardy problems. The Michigan Court of Appeals affirmed Knickerbocker's conviction on December 21, 1993, and the Michigan

---

[1]The jury was instructed on both direct and aiding and abetting theories of guilt as to both charges. Joint Appendix ("J.A.") at 122-24 (Jury Instructions).

Supreme Court denied leave to appeal on July 29, 1994, *People v. Knickerbocker*, 521 N.W.2d 615 (Mich. 1994).

Knickerbocker filed a Motion for Relief from Judgment, which was denied by the trial court on October 22, 1997. On July 15, 1999, the Michigan Court of Appeals dismissed Knickerbocker's appeal because he failed to file it within the applicable time period. On February 29, 2000, the Michigan Supreme Court denied leave to appeal. *People v. Knickerbocker*, 609 N.W.2d 189 (Mich. 2000).

In April 2001, Harry Camp signed an affidavit partially recanting his testimony at trial, stating that although he had testified that Hardyniec drove the car from Melton's home, he was actually not sure who was driving. Knickerbocker attempted to file a second Motion for Relief from Judgment on the basis of this newly discovered evidence, but the trial court returned his motion with a letter dated August 20, 2002, stating that Knickerbocker was permitted to file only one such motion under the Michigan Court Rules. Knickerbocker's attorney attempted to refile, and the trial court denied the motion on January 15, 2003. Knickerbocker filed a complaint for superintending control with the Michigan Court of Appeals, which was dismissed for lack of jurisdiction on May 20, 2003, because "[t]here is no appeal available from a circuit court order denying a subsequent motion for relief from judgment." R.28 (Mich. Ct. App. Superintending Control Order). Knickerbocker then filed a delayed application for leave to appeal with the Court of Appeals, which dismissed his application on August 18, 2003, on the same grounds. The Michigan Supreme Court denied leave to appeal on April 30, 2004. *People v. Knickerbocker*, 680 N.W.2d 418 (Mich. 2004).

Knickerbocker filed a Petition for Writ of Habeas Corpus in U.S. district court on May 11, 2004. Knickerbocker raised six claims: 1) that the trial court abused its discretion by refusing to

5

permit him to file his second Motion for Relief from Judgment; 2) that Knickerbocker was denied due process and a fair trial by the use of Harry Camp's perjured testimony at trial; 3) that he was denied due process because the trial court erred in its jury instructions; 4) that he was denied a fair trial because the prosecution did not disclose certain exculpatory evidence; 5) that the trial court erred by not permitting Knickerbocker to elicit testimony from Mitchell that Hardyniec planned on his own to rob Melton; and 6) that Knickerbocker's trial counsel and appellate counsel were ineffective. The district court determined that Knickerbocker's first two claims, based upon newly discovered evidence, were not barred by the statute of limitations, but denied those claims on the merits. The district court denied a certificate of appealability as to those two claims. Knickerbocker filed a motion in this court for a certificate of appealability as to his first two habeas claims, and we denied his motion on December 19, 2005.

The district court dismissed Knickerbocker's remaining four claims as barred by the statute of limitations. The district court calculated that the one-year limitations period expired, at the latest, on October 22, 1998. The court concluded that Knickerbocker's two claims based upon unrelated newly discovered evidence could not revive his four time-barred claims, and that Knickerbocker had not made a sufficient showing of actual innocence to warrant equitable tolling. The court granted a certificate of appealability as to these four claims, however, stating that "reasonable jurists could find the Court's dismissal of those claims on statute of limitations grounds debatable." Joint Appendix ("J.A.") at 116 (Dist. Ct. COA Order at 2).

Knickerbocker filed a timely notice of appeal.

## II. ANALYSIS

"'This court applies de novo review to the decision of the district court in a habeas proceeding.'" *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005) (quoting *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000)). "Furthermore, '[t]he dismissal of a habeas petition by the district court as barred by 28 U.S.C. § 2244's statute of limitations is reviewed de novo.'" *Id.* (quoting *Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir. 2002)). We review a district court's factual findings for clear error. *Id.* The Supreme Court has indicated in this context, however, that the interpretation of the evidence as a whole and its likely effect on reasonable jurors is primarily a question of law on which we do not defer to the district court's judgment:

> Deference is given to a trial court's assessment of evidence presented to it in the first instance. Yet the [actual innocence] inquiry, we repeat, requires a holistic judgment about "all the evidence" and its likely effect on reasonable jurors applying the reasonable-doubt standard. As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses."

*House v. Bell*, --- U.S. ---, 126 S. Ct. 2064, 2078 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 328, 329 (1995) (internal quotation marks omitted)) (second alteration in original).

## A. The Applicable Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year limitations period for habeas petitions brought by prisoners challenging state-court convictions. 28 U.S.C. § 2244(d). Section 2244(d) states, in relevant part:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

7

. . . .

(2) The time during which a properly filed application for State post-conviction or
other collateral review with respect to the pertinent judgment or claim is pending
shall not be counted toward any period of limitation under this subsection.

*Id.* Prisoners whose convictions became final prior to April 24, 1996, AEDPA's effective date, are

given a one-year grace period in which to file their federal habeas petitions. *McClendon v. Sherman*,

329 F.3d 490, 493 (6th Cir. 2003).

Knickerbocker's convictions became final prior to April 24, 1996. Accordingly, he had one

year from that date to file a habeas petition raising the four claims at issue,[2] excluding any time

during which he had a properly filed application for state post-conviction or collateral review

pending. Knickerbocker concedes that his Petition, filed on May 14, 2004, was technically not

timely filed as to the four claims at issue, but argues that he is entitled to equitable tolling of the

statute of limitations because he has demonstrated that he is actually innocent.[3]

## B. Equitable Tolling for Actual Innocence

Where an otherwise time-barred petitioner makes a sufficiently persuasive showing of actual

innocence, equitable tolling is appropriate, and the federal habeas court will review the merits of the

petitioner's underlying constitutional claims. *Souter*, 395 F.3d at 602; *see also House*, 126 S. Ct.

at 2077-78. "'To be credible, such a claim requires petitioner to support his allegations of

---

[2]Knickerbocker had one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" to file the other two claims that he raised below, 28 U.S.C. § 2244(d)(1)(D), which are not before us on appeal.

[3]Knickerbocker also declares that the four claims at issue were procedurally defaulted in state court. Appellant Br. at 31. The district court concluded that these claims were time-barred, but did not discuss whether they were procedurally defaulted. However, a sufficient showing of actual innocence allows consideration of procedurally defaulted claims as well as time-barred claims, and the same analysis applies. *See Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005).

constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324). "[T]he habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" *House*, 126 S. Ct. at 2077 (quoting *Schlup*, 513 U.S. at 327-28 (internal quotation marks omitted)), "but with due regard to any unreliability of it," *Schlup*, 513 U.S. at 328 (internal quotation marks omitted). "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 126 S. Ct. at 2077 (quoting *Schlup*, 513 U.S. at 329). The Supreme Court has expressed a time-barred petitioner's burden as follows:

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*Id.* Put another way, a petitioner must demonstrate that "it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* at 2086. The Court has emphasized that this standard is "demanding and permits review only in the extraordinary case," *id.* at 2077 (internal quotation marks omitted), but still provides a petitioner "a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327.

In support of his claim of actual innocence, Knickerbocker points to five pieces of evidence that were not presented at trial. First, Harry Camp stated in an April 13, 2001 affidavit that he was not sure who was driving, a departure from his testimony at trial that Hardyniec drove the car from Melton's home. Second, Monte LaClear stated in an April 19, 1996 affidavit that he was

incarcerated with Hardyniec in the weeks leading up to trial and that Hardyniec told him that Knickerbocker "did not participate in nor had he any prior knowledge of the strangling of the victim." J.A. at 65 (LaClear Aff.). Third, Knickerbocker submitted to a polygraph examination in November 2004. Fourth, Sharon Mitchell was not allowed to testify before Knickerbocker's jury that Knickerbocker was not present when Hardyniec and Marvin Valdez devised their plan to rob Melton. Fifth, Dr. Joseph E. Talbot, a radiologist, submitted a letter in August 2001 stating that, based on Knickerbocker's initial emergency room report and first follow-up visit after breaking his wrist, Knickerbocker would be expected to have "significant pain and swelling for 3-4 weeks and limited strength and motion for at least 4-8 weeks." J.A. at 67 (Talbot Letter). Knickerbocker argues that this evidence shows that it is more likely than not that no reasonable juror would convict him either of first-degree felony murder[4] or of armed robbery.[5]

Camp's affidavit is minimally persuasive evidence that Knickerbocker is actually innocent. Affidavits by trial witnesses recanting their testimony are viewed with "extreme suspicion." *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (internal quotation marks omitted). Moreover,

---

[4]Under Michigan law, first-degree felony murder includes, in relevant part, "[m]urder committed in the perpetration of, or attempt to perpetrate, . . . robbery [or] . . . larceny of any kind." MICH. COMP. LAWS § 750.316(1)(b). The traditional common-law felony murder doctrine does not apply in Michigan; the prosecution must prove "malice" in every murder case, defined as "the intention to kill, the intention to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980). Proof of intent to commit the underlying felony does not necessarily prove malice. *Id.*

[5]Under Michigan law, robbery is defined as, "in the course of committing a larceny of any money or any other property that may be the subject of larceny, us[ing] force or violence against any person who is present, or . . . assault[ing] or put[ting] the person in fear." MICH. COMP. LAWS § 750.530(1). Armed robbery includes, in relevant part, "in the course of engaging in [a robbery], possess[ing] a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon." MICH. COMP. LAWS § 750.529.

10

Larry Magier also testified that Hardyniec was driving, and Camp's affidavit does not refute Magier's testimony, but merely states that Camp is now uncertain. Furthermore, Knickerbocker admitted being in the car, and Camp's affidavit has no bearing on whether Knickerbocker was guilty of aiding and abetting[6] the murder and armed robbery.

LaClear's affidavit is also only minimally persuasive evidence in support of Knickerbocker's actual innocence claim. If believed, LaClear's account of Hardyniec's statements appears to exonerate Knickerbocker of any guilt. However, LaClear's statements are hearsay, MICH. R. EVID. 801, and thus presumptively less reliable than direct testimony.[7] Moreover, other hearsay testimony

---

[6]The Michigan Supreme Court has stated the standard for proving aiding and abetting under Michigan law as follows:

> To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999).

[7]LaClear's account may or may not be admissible, depending on the trial court's application of Michigan Rule of Evidence 804(b)(3):

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (3) *Statement Against Interest*. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

MICH. R. EVID. 804(b)(3). However, the appropriate focus here is whether the evidence is reliable regardless of whether the statements would be admitted, as the court "is not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327.

11

implicates Knickerbocker on both direct and aiding and abetting theories of guilt. According to both Marvin Valdez and the police, Hardyniec stated that Knickerbocker strangled Melton, and both Marvin Valdez and Sharon Mitchell reported that Knickerbocker helped plan the robbery.

Knickerbocker's polygraph evidence is not persuasive evidence of actual innocence. Polygraph results themselves are generally inadmissible as unreliable. *See King v. Trippett*, 192 F.3d 517, 523-24 & n.3 (6th Cir. 1999); *People v. Jones*, 662 N.W.2d 376, 382 (Mich. 2003). Knickerbocker is correct that his willingness to submit to a polygraph examination may be considered evidence of his credibility in some circumstances. *See Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273, 277 (6th Cir. 1985). In these circumstances, however, it is difficult to see how his willingness has any probative value, as he had no duty to report the results if he failed the test. Moreover, Knickerbocker did not testify at trial, so his credibility is of little relevance.

Sharon Mitchell's potential testimony is also not persuasive evidence of Knickerbocker's actual innocence, and may actually be stronger evidence of his guilt. Mitchell testified before Hardyniec's jury, but not Knickerbocker's jury, that on the day before the murder, Hardyniec and Martin Valdez devised a plan to rob Joe Melton. Knickerbocker argues that because he was not present, Mitchell's testimony is evidence that Knickerbocker was not aware of and did not participate in the murder or robbery. However, Mitchell further testified that after devising the plan, Hardyniec called Knickerbocker and "asked him if he wanted to help him pull the scam, to scam Joe." R.19 at 191 (Mitchell Test.).

Finally, the letter from Dr. Talbot is minimally persuasive evidence at best. Knickerbocker argues that Dr. Talbot's letter describing Knickerbocker's probable pain and range of motion is evidence that he did not murder Melton. First, this evidence does not refute the charge that

12

Knickerbocker aided and abetted the murder. Second, Knickerbocker's treating physician testified at trial as to his range of motion, stating that he would have "some weakness" but that he "would be able to use the fingers to grip an object." R.19 at 15 (Weingarden Test.). Thus, Dr. Talbot's potential testimony would be largely cumulative, and to the extent that it conflicts with the testimony of Knickerbocker's own treating physician, Dr. Talbot's post hoc analysis is much less reliable evidence.

In sum, Harry Camp's affidavit and Dr. Talbot's letter tend to show, albeit with only limited probative value, that Knickerbocker did not have the opportunity or ability to strangle Melton. LaClear's hearsay affidavit is additional evidence, though again of only limited probative value, that Knickerbocker did not strangle Melton. LaClear's affidavit is also the only new evidence tending to show that Knickerbocker did not aid and abet Melton's murder. The prosecution's other evidence introduced at trial remains unrefuted, including Larry Magier's statement that Hardyniec was driving, Marvin Valdez's testimony that Knickerbocker and Hardyniec planned to rob Melton, Marvin Valdez's testimony that Hardyniec reported that Knickerbocker killed Melton, a piece of red wire consistent with Melton's injuries found at Knickerbocker's home, and Knickerbocker's statement to police that he was present when Melton was killed, together with inconsistencies in his statement and his apparent nervous reaction when police pointed out those inconsistencies. Considering all the evidence, we believe that Knickerbocker has not shown that it is more likely than not that no reasonable juror would convict him beyond a reasonable doubt.

Other decisions in which habeas petitioners have established actual innocence under this standard demonstrate that Knickerbocker's showing falls short. In *Souter v. Jones*, we noted that "[t]he only direct evidence linking Souter to [the victim's] death is the bottle" that was allegedly

13

used to kill the victim. *Souter*, 395 F.3d at 597. Even at trial, there were doubts as to whether the bottle was the murder weapon, as pieces of glass were found on the victim that did not match the bottle. *Id.* at 596. Souter introduced significant further evidence in support of his innocence, including evidence from the manufacturer that the bottle could not have shattered as alleged, the opinion of two doctors that the bottle did not cause the victim's injuries (recanting their own trial testimony that it did), and pictures showing the victim covered in a substantial amount of blood though no blood was ever found on Souter. *Id.* at 596-97. We concluded that Souter had "presented new evidence which raises sufficient doubt about his guilt and undermines confidence in the result of his trial." *Id.* at 597.

Similarly, in *House v. Bell*, the Supreme Court concluded that House had undermined the state's only direct evidence linking House to the murder. At trial, the state asserted that semen on the victim's nightgown and panties came from House, but DNA testing years later conclusively proved that it did not. *House*, 126 S. Ct. at 2078-79. The state also asserted at trial that blood from the victim stained House's jeans at the time of the murder, but House introduced testimony from a medical examiner that degradation of the blood was consistent with a spill from samples, not blood from the victim herself; that a vial and a quarter of blood samples were unaccounted for; and that the blood spilled at least once during transport. *Id.* at 2083. Finally, House introduced evidence that the victim's husband had abused her and that he had admitted to two separate witnesses that he had killed his wife. *Id.* at 2083-85. Of special importance to this case, the Court noted that the testimony of those two hearsay witnesses had "more probative value than, for example, incriminating testimony from *inmates*, suspects, or friends or relations of the accused." *Id.* at 2085 (emphasis added). The Court summarized:

> [T]he central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect. Accordingly, and although the issue is close, we conclude that this is the rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt.

*Id.* at 2086. Therefore in *House*, the Court concluded that the state's procedural-default rule did not bar federal habeas corpus relief given House's demonstration of "a compelling claim of actual innocence." *Id.* at 2068, 2086.

In contrast to the petitioners in both *Souter* and *House*, Knickerbocker admits that he was present when the crime occurred. Knickerbocker attempts to argue that he did not have the physical ability to strangle Melton because of his position in the car and his injured arm, but unlike in *Souter*, the evidence remains strong that Knickerbocker could have been the killer. Knickerbocker attempts to demonstrate that Hardyniec admitted that he was the sole killer, but unlike in *House*, Hardyniec's purported admission absolving Knickerbocker of guilt is of limited probative value and is countered both by other hearsay evidence pointing to Knickerbocker as the killer and by evidence establishing that Knickerbocker aided and abetted the robbery and murder.

Considering all the evidence, we conclude that Knickerbocker has not shown that it is more likely than not that no reasonable juror would convict him either of first-degree felony murder or of armed robbery. Accordingly, Knickerbocker is not entitled to equitable tolling of the statute of limitations, and the four claims at issue are time-barred.

### III. CONCLUSION

Because Knickerbocker has not shown that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt, we do not apply the equitable-tolling doctrine, and we **AFFIRM** the judgment of the district court dismissing the claims as time-barred.