NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0735n.06

**No. 12-4213**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 08, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JEFFREY E. EBERLE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| WARDEN, MANSFIELD CORRECTIONAL | ) | OHIO |
| INSTITUTION, | ) | |
| | ) | |
| Respondent-Appellee. | ) | **OPINION** |
| | ) | |

Before:  MOORE, KETHLEDGE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  In September 2006, Jeffrey Eberle pled guilty in an Ohio court to aggravated murder and was sentenced to life imprisonment with the possibility of parole.  Eberle did not appeal.  Nearly three years later, however, Eberle filed a motion to withdraw his guilty plea, which the Ohio courts ultimately denied in December 2010.  A year later, Eberle sought habeas relief in federal district court.  The state urged that Eberle's time-barred petition should be dismissed and the district court agreed.  We do too and **AFFIRM** its order dismissing Eberle's habeas petition.

## I.  BACKGROUND

Jeffrey Eberle pled guilty in September 2006 to aggravated murder under Ohio state law. Represented by counsel, Eberle admitted that he "purposely and with prior calculation" caused the death of Michael Fish.  Eberle specifically agreed that on the night of December 14, 2005, he and

Jason Evick took Fish to a secluded location where Eberle assaulted Fish with a shovel. Fish died of blunt force trauma. In exchange for his plea, the prosecution dismissed all other charges against Eberle. Eberle was sentenced to life imprisonment with the possibility of parole after serving 20 years.

Eberle did not appeal from his sentence or conviction but, nearly three years after he was sentenced, he filed a motion to withdraw his guilty plea on July 20, 2009. The motion was based largely on the work of Orrin Nordstrom, a private investigator who tracked down potential leads in Eberle's case from May 2007 to December 2008. In it, Eberle complained that his trial counsel failed to tell him the contents of an allegedly damaging statement that a witness, Ryan Goodman, planned to make at trial, despite Eberle's request to learn what Goodman had to say. Eberle also faulted his counsel for failing to investigate the potential testimony of Amanda Fugate, Evick's girlfriend at the time of Fish's murder, who allegedly told police that Evick admitted to killing Fish. And springing from this last factual bit, Eberle finally alleged that the prosecution's failure to disclose Evick's admission violated *Brady v. Maryland*, 373 U.S. 83 (1963). To support his claims, Eberle attached affidavits from Goodman, the witness, and Nordstrom, the investigator, and submitted one himself. Eberle's bottom-line claim was that he would not have pled guilty had he known of Goodman's statement and Evick's admission.

The trial court denied Eberle's withdrawal motion on September 23, 2009. Eberle sought review in the state court of appeals. As before, he claimed only that he would not have pled guilty but for counsel's ineffectiveness and the government's misconduct. During oral arguments, the appellate panel *sua sponte* asked whether Eberle's plea was invalid because the trial court wrongly

informed Eberle that he was subject to a mandatory five-year term of postrelease control if and when

he was released from prison. (The court intuited an error because the crime to which Eberle pled

guilty, aggravated murder, is an unclassified felony in Ohio that does not carry a mandatory

postrelease-control term. *See State v. Clark*, 893 N.E.2d 462, 470 (Ohio 2008)). The court requested

supplemental briefing on the issue, and asked the parties to weigh in on whether Eberle's case should

be returned to the trial court for further proceedings.

On the merits of Eberle's claims, the appellate court affirmed the trial court's denial on

August 2, 2010. On the postrelease-control issue, however, the court decided that the trial court

erred in its explanation. That error, though, did not necessitate sending the case back down for

resentencing; instead, the reviewing court simply vacated the postrelease-control portion of the lower

court's sentencing entry. The Ohio Supreme Court denied Eberle leave to appeal on December 15,

2010.

A year later, on December 13, 2011, Eberle filed his federal habeas corpus petition setting

forth the same grounds of relief raised in his withdrawal motion—constitutionally ineffective

assistance of counsel and governmental misconduct. *See* 28 U.S.C. § 2254. The magistrate judge

concluded that Eberle's petition was time-barred under two alternative time-limit provisions of the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat.

1214 (1996). Under the first, 28 U.S.C. § 2244(d)(1)(A), the statute of limitations expired in

October 2007, one year after the deadline passed to appeal the September 2006 state-court judgment.

Despite Eberle's arguments to the contrary, the magistrate judge found that neither Eberle's plea-

withdrawal motion nor the state appellate court's sentence modification served to restart the one-year

statute of limitations under § 2244(d)(1)(A). Under the second applicable limitations provision, 28 U.S.C. § 2244(d)(1)(D), the magistrate judge found that the petition was still untimely, even if the court agreed with Eberle that the clock was tolled while his plea-withdrawal motion wended its way through the state courts.

The magistrate judge then considered whether Eberle was entitled to equitable tolling, which might otherwise save his late-filed petition, finding he was not because his failure to file on time did not unavoidably arise from circumstances beyond his control. After finally concluding that Eberle's claim of actual innocence was untenable, the magistrate judge recommended that Eberle's time-barred petition be dismissed.

The district court adopted the magistrate judge's report. In doing so, it evaluated a supplemental affidavit from Nordstrom—narrating Nordstrom's unsuccessful efforts to obtain an affidavit from Fugate directly—that Eberle submitted along with his objections to the magistrate judge's report. Even with the supplemental affidavit, the court maintained that Eberle still failed to establish a credible claim of actual innocence that would allow it to consider his otherwise untimely claims. The district court dismissed Eberle's petition but granted him a certificate of appealability that enables review of "the procedural statute of limitations issue" raised in Eberle's case. We turn to that now. *See* 28 U.S.C. § 2253.

## II. ANALYSIS

We review a district court's dismissal of a time-barred habeas petition de novo, but assess its factual findings—to the extent it makes any—under the deferential clear-error standard. *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005).

AEDPA sets a one-year statute of limitations for state prisoners seeking federal habeas corpus relief, and lays out four ways to count that period. Just two are relevant here. The one-year filing period may run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Alternatively, it may begin on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id*. § 2244(d)(1)(D). Under either provision, a running limitations period may be tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id*. § 2244(d)(2).

## A. Finality of the judgment

Analyzed under § 2244(d)(1)(A), Eberle was required to file his petition by October 19, 2007. Eberle did not appeal his conviction by the trial court, so it became final on October 19, 2006, 30 days after the court entered its judgment. *See* Ohio App. R. 4(A). His one-year limitations period thus began to run on October 20, 2006, and expired one year later. Although a tolling action filed during this time could have extended the period, none was filed. Because Eberle did not file a habeas petition until December 13, 2011—long after October 2007—his petition is time-barred under § 2244(d)(1)(A).

Eberle tries to escape this conclusion in two ways, but neither one helps him. First, he argues that his conviction was not final in 2006 because the plea-withdrawal motion he filed on July 20, 2009, served to "reset" the one-year clock with respect to the claims made in it. Eberle contends that as long as a state motion is timely under state law, it is timely for federal-habeas purposes too.

We see it differently. Although this court has not directly addressed whether a motion to withdraw a guilty plea in Ohio resets AEDPA's one-year clock or otherwise alters the date on which a conviction becomes "final" under § 2244(d)(1)(A), Eberle's answer to these questions cuts against the grain of AEDPA's purpose and our precedents. AEDPA sets strict filing deadlines in order to promote the finality of convictions and curb dilatory tactics. *See Carey v. Saffold*, 536 U.S. 214, 222 (2002) (the one-year filing rule works to "prevent[] prisoners from delaying their federal filing"); *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) ("AEDPA seeks to eliminate delays in the federal habeas review process."). To that end, a conviction is "final" under AEDPA once direct review is completed or the time for seeking it expires. But if Eberle's view were the law—if after AEDPA's statute of limitations had fully expired it could be restarted when a petitioner filed a motion to withdraw his guilty plea, even where, as here, the state places no deadline on its filing, *see State v. Bush*, 773 N.E.2d 522, 525–26 (Ohio 2002)—habeas petitioners could indefinitely extend the limitations period by delaying the filing of a withdrawal motion. This reading flushes the meaning out of AEDPA's one-year statute of limitations and upends the statute's goal of heading off unwarranted delay.

Our cases similarly reject the view that a plea-withdrawal motion restarts AEDPA's one-year clock. In *Searcy v. Carter*, we held that the denial of a motion for delayed appeal—which enables a defendant to file a delayed appeal in Ohio's high court after the time for seeking it expires—does not "retrigger[]" AEDPA's statute of limitations. 246 F.3d 515, 519 (6th Cir. 2001). We reasoned that holding otherwise would "effectively eviscerate" the one-year limitation, since a motion for delayed appeal, just like a plea-withdrawal motion, can be sought "at any time, even many years after

conviction." *Id*. (internal quotation marks omitted). AEDPA's statute-of-limitations provision would thus be "meaningless" and "effectively eliminated." *Id*. (internal quotation marks omitted). A year earlier, in *Bronaugh v. Ohio*, we similarly concluded that 2244(d)(1)(A)'s one-year clock does not run anew after an Ohio appellate court denies a defendant's application to reopen his direct appeal due to ineffective assistance of appellate counsel. 235 F.3d 280, 286 (6th Cir. 2000); *see also* Ohio R. App. P. 26(B).

The upshot of these cases is twofold. First, they rebut Eberle's claim that the permanent availability of state-made avenues to challenge the validity of a conviction or sentence bars a conviction from ever becoming final for AEDPA purposes. And second, they reflect that resort to such avenues will not necessarily restart the one-year limitations period. (That said, both *Searcy* and *Bronaugh* recognize that the review procedures in question may toll the limitations period. Tolling, though, "can only serve to pause a clock that has not yet fully run"; it does not "revive the limitations period" or "restart the clock at zero." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (internal quotation marks omitted). So while Eberle's plea-withdrawal motion could have stopped the running of the clock had it been filed in the one-year window that closed in October 2007, it was not filed then. After the window closed, there was nothing left to toll.)

Eberle responds that he could not litigate his § 2254 petition until fully appealing his plea-withdrawal motion in state court because he was required to exhaust his state remedies. *See* 28 U.S.C. § 2254(b)(1)(A). Exhaustion under AEDPA requires a petitioner to "fairly present[]" each claim in a § 2254 petition to the state courts before a federal court can review it. *See Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009) (internal quotation marks omitted). But we have never

suggested that a habeas petitioner in Ohio must file a plea-withdrawal motion to properly exhaust his claims. Put simply, a failure to file this motion does not render a petitioner's habeas claims unexhausted.

To escape the conclusion that his petition is time-barred under § 2244(d)(1)(A), Eberle presses an alternative argument—that the August 2, 2010 appellate court decision vacating the part of the trial court's sentencing entry that imposed postrelease control amounted to a new sentence that, in turn, restarted the statute of limitations. Eberle's claim is based on the concept that a judgment is only "final" under § 2244(d)(1)(A) after direct review of both the conviction *and* the sentence. *See Burton v. Stewart*, 549 U.S. 147, 156 (2007) (per curiam) ("Final judgment in a criminal case means sentence. The sentence is the judgment.") (internal quotation marks omitted). So, for example, in the case of a petitioner whose conviction is affirmed on direct review but whose case is remanded for resentencing because his initial sentence is infirm for some reason, the judgment is "final" only after direct review of the punishment imposed at resentencing. *See Rashad v. Lafler*, 675 F.3d 564, 567–69 (6th Cir. 2012). As a result, the AEDPA clock resets then.

But does *any* sentencing modification constitute a "resentencing" sufficient to restart the limitations period? We don't see how it can. Take two examples. First, we have recognized (albeit in an unpublished order) that when "a federal prisoner is resentenced following a Rule 35(b) motion [to reduce a sentence for substantial assistance] . . . , the statute of limitations does not start from the date of the resentencing judgment." *Reichert v. United States*, 101 F. App'x 13, 14 (6th Cir. 2004) (order). Other circuits have reached a similar conclusion. *See, e.g.*, *Murphy v. United States*, 634 F.3d 1303, 1313 (11th Cir. 2011); *United States v. Sanders*, 247 F.3d 139, 142–43 (4th Cir. 2001).

As well, a modification of a previously imposed sentence to afford presentence credits also does not affect the date on which finality attaches for statute-of-limitations purposes. *See, e.g.*, *Graham v. Smelser*, 422 F. App'x 705, 707 (10th Cir. 2011). These authorities indicate that not every modification that can be made to a sentence *automatically* restarts the statute of limitations.

This case, however, does not require us to sort out where the precise line lies between sentence modifications that are insufficient to restart the limitations period on the one hand, and new sentences that are sufficient to do so on the other. Without laying down a rule to distinguish the two poles, two observations about the alteration made to Eberle's sentence persuade us that it did not delay finality for habeas purposes. First, Eberle's sentence was modified to remedy a technical error. The change did not pertain to his underlying conviction, nor did it relate to the basis of the plea bargain Eberle struck with the state. Second, as a technical error, his sentence was not remanded to the trial court: no resentencing hearing was held, no new sentencing entry was filed, and no new judgment issued. In these circumstances, a single sentence modification—which, notably, Eberle did not raise in his withdrawal motion—is not a new sentence that restarts the AEDPA clock.

Eberle's petition is time-barred under § 2244(d)(1)(A), unless statutory or equitable-tolling principles apply. We next consider whether Eberle's petition fares any better under § 2244(d)(1)(D), the only other statutory means to measure AEDPA's limitations period in this case.

**B. Discovery of the factual predicate**

Eberle alternatively argues that his petition is timely under § 2244(d)(1)(D), which allows the one-year filing period to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." But even if we credit

Eberle's contention that his claims could not have been raised earlier, we still can't see how Eberle's petition was filed within the limitations period.

The timeline is critical to bear in mind. Eberle was convicted and sentenced on September 19, 2006. Beginning in May 2007 and continuing through December 2008, Nordstrom, Eberle's private investigator, tracked down potential witnesses with information regarding the murder. Nordstrom's affidavit, submitted with Eberle's habeas petition, provides two facts on which Eberle heavily relies. The first is that Amanda Fugate, Jason Evick's girlfriend at the time of Michael Fish's death, told Nordstrom that Evick confessed to her that he killed Fish (a confession Fugate allegedly reported to the police). The second is that Fish and Jeff Weldon, a potential unindicted coconspirator, had an antagonistic relationship due to their involvement in illegal drug trafficking.

Although the magistrate judge assumed without deciding that Eberle's petition began to run on May 26, 2009, the day that Eberle signed an affidavit recounting the details Nordstrom learned through his investigation, we cannot do the same. Eberle "bears the burden of proving that he exercised due diligence" in order for the statute of limitations to run from the date he discovered the factual predicate of his claim. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006). Recall that Nordstrom wrapped up his investigation—which discovered each of the factual predicates of Eberle's claims for habeas relief—in December 2008. Yet it took Eberle five months to execute his own affidavit, and two more months to file the withdrawal motion.

The problem is less the delay and more Eberle's failure to explain it. Eberle may not have been able to file his affidavit or the plea-withdrawal motion sooner for many reasons—a medical condition, prison transfer, or an inability to communicate with Nordstrom, for example. But Eberle

has offered no facts for us to decipher the reasons behind the delay. In light of this failure, and the fact that Eberle was counseled throughout these proceedings, Eberle has not made the showing necessary to extend the start of the limitations period under § 2244(d)(1)(D) beyond December 31, 2008, the latest date on which Nordstrom completed his investigation.

If Eberle's one-year limitations period began on December 31, 2008, 201 days passed before Eberle filed his plea-withdrawal motion on July 20, 2009. The parties agree that the limitations period was tolled until the Ohio Supreme Court denied Eberle leave to appeal on December 15, 2010. They disagree, however, as to whether the 90-day period to apply for a writ of certiorari to the United States Supreme Court following the Ohio Supreme Court's denial paused the clock. The underlying question is whether a plea-withdrawal motion under Ohio law is properly characterized as post-conviction or collateral relief (the state's position), or part of a defendant's direct appeal (Eberle's view). If such a motion is collateral relief for AEDPA purposes, then there is no tolling during the 90-day period. *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007); *see also Sherwood v. Prelesnik*, 579 F.3d 581, 588 (6th Cir. 2009). But if a plea-withdrawal motion is considered part of direct review, then the 90-day period may be tolled. *See Clay v. United States*, 537 U.S. 522, 527–28 (2003) (holding that "direct review" of a judgment of conviction is not "final" until the United States Supreme Court has declined review or decided the case on the merits).

We are not the first court to confront this question. In *Bush*, the Ohio Supreme Court held that because a plea-withdrawal motion "targets the withdrawal of a plea" and is "not a collateral challenge to the validity of a conviction or sentence," it is properly seen as a part of the direct-review process. 773 N.E.2d at 526 (internal quotation marks omitted); *see also Colwell v. Tanner*, 79 F.

App'x 89, 91 (6th Cir. 1993) (stating in dicta that a plea-withdrawal motion falls within direct review). *Bush*, however, is "authoritative only as a matter of state law," not AEDPA. *Lopez v. Wilson*, 426 F.3d 339, 351 (6th Cir. 2005) (en banc).

We don't have to delve too deeply into the issue here, however, since Eberle's petition is untimely whether or not the AEDPA clock paused during the 90-day period. As noted, Eberle used up 201 of the 365 days he had to file his petition between the time he discovered the factual predicate of his claims on December 31, 2008, and when he submitted his plea-withdrawal motion on July 20, 2009. The Ohio Supreme Court denied Eberle leave to appeal on December 15, 2010. Even if we were to hold that the limitations period was tolled for the next 90 days, this only takes Eberle through to March 15, 2011, after which the clock began to tick again. From that point until Eberle filed his petition on December 13, 2011, 273 days passed. Put otherwise, Eberle had until August 26, 2011, to file his petition under § 2244(d)(1)(D). Because he did not do so, his petition is time-barred.

## C. Equitable tolling

That is true, of course, unless Eberle is entitled to equitable tolling. This doctrine, which applies to AEDPA's limitations period, *see Holland*, 130 S. Ct. at 2560, may serve to save an otherwise untimely petition if "a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control," *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 187 (2012). To be eligible, Eberle must show that (1) "he has been pursuing his rights diligently" and (2) "some extraordinary circumstance stood in his way" to foreclose timely filing. *Holland*, 130 S. Ct. at 2562 (internal quotation marks omitted).

Eberle says he couldn't file his claims earlier because "he only learned of the evidence proving his innocence" after Nordstrom's investigation. But that was in December 2008. The issue is Eberle's quiescence afterwards—the nearly five months it took to submit his own affidavit, and the two additional months to file the plea-withdrawal motion. Absent an explanation for these delays, Eberle's diligence is difficult to spot. Because Eberle's equitable-tolling argument fails at *Holland*'s first step, we move on without looking into the second.

**D. Actual innocence**

Notwithstanding that, Eberle insists that he can successfully pass through the actual-innocence gateway. If that were so—and it is not—Eberle's lack of diligence would not stand in the way of our consideration of his otherwise untimely petition. In *McQuiggin v. Perkins*, the Supreme Court recently held that a showing of actual innocence works to "overcome" AEDPA's statute of limitations, and not simply to excuse late filing. 133 S. Ct. 1924, 1930–31 (2013). When faced with a "convincing" actual-innocence claim, *McQuiggin* makes clear, a court cannot consider a petition's untimeliness as "an absolute barrier to relief." *Id*. at 1928. Although a petitioner who asserts a convincing actual-innocence claim does not have to "prove diligence to cross a federal court's threshold," timing remains "a factor relevant in evaluating the reliability of a petitioner's proof of innocence." *Id*. at 1935 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing.").

In addition to clarifying that there are no temporal limitations to presenting evidence in support of an actual-innocence claim, *McQuiggin* also reiterated the standard needed to make one out. *Id*. at 1931. The touchstone of the inquiry is whether a petitioner's "new evidence shows 'it

is more likely than not that no reasonable juror would have convicted [him].'" *Id*. at 1933 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." *Id*. (internal quotation marks omitted).

Does Eberle's new evidence, taken together with the old, establish "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt"? *Schlup*, 513 U.S. at 327. We cannot say it does. The new evidence Eberle presents consists of three core facts. The first is a statement Ryan Goodman made that Eberle mistakenly believes is exculpatory. The second is Nordstrom's report that Fugate revealed to him that she told the police that Evick confessed to killing Fish. And the last is Nordstrom's remark that Fish and Jeff Weldon had an antagonistic relationship due to their involvement in drug trafficking.

We begin with Goodman's statement. Eberle claims that had he had known of it before he pled guilty, he would not have taken the plea deal. Goodman, it turns out, planned to testify that Eberle said only one thing to Goodman about Fish: "Motherfucker tried to play us so we got him." If anything, Goodman's statement supports Eberle's guilt. It blinks reality to suggest that Eberle's statement—"we got him"—makes it "more likely than not that no reasonable juror would have convicted" Eberle. *McQuiggin*, 133 S. Ct. at 1933 (internal quotation marks omitted).

Fugate's statement to Nordstrom gets a bit closer, but just barely. While Eberle alleges it exonerates him, we disagree for three reasons (all of which apply with equal force to Nordstrom's supplemental affidavit). First, Fugate's statement in Nordstrom's affidavit is hearsay-within-hearsay evidence. *See* Ohio R. Evid. 805. While that isn't disqualifying in itself—a court, after all, must consider "all the evidence . . . without regard to whether it would necessarily be admitted under rules of admissibility," *House*, 547 U.S. at 538 (internal quotation marks omitted)—a juror could reasonably discount Fugate's statement insofar as it is less reliable than direct testimony. *See Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007). Second, Fugate's statement, even if reliable, stands against Eberle's admission that he "purposely and with prior calculation" caused Fish's death. Eberle stipulated that he and Jason Evick took Fish to a secluded location where Eberle assaulted Fish with a shovel. Third, Fugate's statement at most supports the view that Eberle was only complicit in Fish's death. Even if that were so, Eberle could still be convicted as the principal offender. *See* Ohio Rev. Code § 2923.03(F) (a complicit defendant "shall be prosecuted and punished as if he were a principal offender"). Eberle notably does not argue that Fugate's statement undermines any element of the offense he pled guilty to, and that is fatal to his actual-innocence claim.

The final fact Eberle relies on to prove his claim is Nordstrom's remark that Fish and Jeff Weldon somehow clashed over their involvement in drug trafficking. Ignore for the moment that the source of Nordstrom's report is unknown and the statement is otherwise vague. (What involvement did the parties have in drug trafficking? When did it occur? Why was the relationship antagonistic?) The bigger problem is that this statement suggests no more than that another person

quarreled with Fish and so may have had a motive to harm him. Finally, the first and second reasons for rejecting Fugate's statement as evidence of actual innocence apply to the Weldon story as well.

To wrap it up, then, Eberle's actual-innocence evidence, even if new, is not adequate to show that no reasonable juror would have convicted him. *See McQuiggin*, 133 S. Ct. at 1936.

## III. CONCLUSION

Because no statutory basis exists to save Eberle's time-barred petition, and Eberle is unable to make a credible claim of actual innocence or demonstrate his entitlement to equitable tolling, we **AFFIRM** the district court's judgment.