James G. Carr, Sr. U.S. District Judge[1]
This is a state prisoner's habeas case under 28 U.S.C. § 2254.
In 2010, a jury in the Circuit Court of Wayne County, Michigan, convicted the petitioner, Paul Simmons, of the second degree murder of Elmon Bostic and an attendant firearms offense. The trial court imposed a twenty-to-forty year sentence on the murder conviction and a consecutive two-year sentence on the firearms conviction.
The Michigan courts affirmed the convictions on direct appeal, People v. Simmons , 2011 WL 3118802 (Mich. App. 2011), and rejected a collateral attack.
Simmons now seeks a writ of habeas corpus on seven claims: 1) prosecutorial misconduct; 2) improper admission of evidence; 3) insufficient evidence to convict; 4) ineffective assistance of trial counsel; 5) ineffective assistance of appellate counsel; 6) an unreasonable delay in arrest and a speedy trial violation; and 7) improper admission of Simmons's out of court statements. (Doc. 13).
For the reasons that follow, I hold that Simmons's first, second, third, sixth, and seventh claims fail on the merits. I also hold that his ineffective assistance claims are untimely under 28 U.S.C. § 2244(d)(1)(A), but that further proceedings - in the form of a period of discovery and an evidentiary hearing - are warranted on Simmons's contention that I should excuse the time bar and reach the merits of those claims because he is actually innocent. See McQuiggin v. Perkins , 569 U.S. 383, 399, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013). Finally, I will hold a decision on the ineffective assistance claims in abeyance pending the outcome of the hearing.
Background
The prosecution's case against Simmons permitted the jury to find that Simmons *726 and Bostic had been together on the morning of the murder; that Simmons was angry at Bostic, who won money, a gun, and speakers from Simmons while gambling; and that Simmons was seen leaving the crime scene with a gun in his hand.
A. The Withdrawn Alibi
To counter this evidence, the defense intended to present an alibi defense that Simmons was working at Excell Personnel, in Detroit, on June 28, 2006. Ten days before trial, defense counsel Luther Glenn Jr. filed an alibi notice regarding this defense. He also produced a list of supporting witnesses and copies of what apparently were Simmons's pay stubs. (ECF No. 7-1, PageID 97; ECF No. 7-4, PageID 186-87).
On the morning of voir dire, however, defense counsel announced that he was withdrawing the alibi. (ECF No. 7-4, PageID 185 -86). Glenn informed the court that he had discussed this issue with Simmons, and, without objection, Simmons confirmed on the record that he understood "we won't be calling these witnesses to support an alibi[.]" (Id. , PageID 186).
Following this exchange, the prosecutor disclosed his belief that the pay stubs were forged and the alibi false. (Id. ).
According to the prosecutor, his investigation revealed that: 1) Social Security records established that Simmons did not start working at Excell until much later in 2006; 2) Simmons had previously told police that he was unemployed at the time of the murder; 3) Simmons also told his probation officer in an unrelated case that he started working at Excell in November, 2006; and 4) an Excell managerial employee had never seen paystubs like the ones tendered by the defense. (Id. , PageID 187-89).
"I think what it looks like to me," the prosecutor concluded, "is that maybe somebody in the Defendant's family - obviously it wasn't the Defendant because he was incarcerated in jail, but you can do a lot things with the computers these days and I think it's possible maybe somebody in his family" created the paystubs. (Id. , PageID at 189). The prosecutor emphasized that defense counsel "was as surprised at this as I was." (Id. ).
This apparent fraud on the court notwithstanding, the trial judge did not make any factual findings as to the source of the false paystubs. During collateral review in state court, however, Simmons would file an affidavit stating that it was defense counsel himself who created this alibi and the supporting documentation. (ECF No. 17-2, PageID 1803, 1808).
B. Trial Evidence
On June 27, 2006 - the night before the murder - Bostic visited his mother's home with Simmons. The men left together, with Simmons driving a blue Crown Victoria. Simmons,supra , 2011 WL 3118802 at *1.
The next morning, June 28, Simmons and Bostic went to the home of Bostic's good friend Pasua Keith, arriving in either a blue Crown Victoria or blue Grand Marquise. Id. According to Keith, Bostic and Simmons gambled on her front porch for two or three hours. Id. Simmons lost several hundred dollars to Bostic, as well as a .38 caliber handgun and a set of car stereo speakers. Id. Simmons was angry and accused Bostic of cheating, but Keith heard him say that "it was okay because he would get everything back." Id. Bostic and Simmons left Keith's house together "shortly after noon." Id.
Bostic's body was found later that day in an alley behind "the St. Julian Church Elementary School located at the southwest corner of the intersection of Chalmers Street and Longview Street in Detroit." Id. A teacher at the school testified that she heard gunshots between 1:00 and 2:00 p.m. on June 28. She looked out a window a few minutes later and saw "a *727 blue Crown Victoria, driven by an African-American male, heading west on Longview Street." Id.
Horace Smith lived on Longview Street. Id. He was working on his roof when he heard gunshots coming from behind the school. Id. Looking toward the school, Smith saw a young African-American man holding a gun at his side get into a blue Crown Victoria and drive the car west. Id. Smith got down off the roof and went out to the street, where he had a clear view of the driver as the car went past him. Id. At a line-up in 2009, about three years after the killing, Smith identified Simmons, whom Smith did not know and had not seen before, as the driver of the blue car.[2] Id.
Finally, Andre Lewis testified that he had spoken to Bostic on the day of the murder. Later that day, Lewis and a friend, Desmond McCoy, saw Simmons getting out of a dark truck on Nottingham Street. Id. ; (ECF No. 7-6, PageID 597-98). When they asked Simmons about losing money to Bostic while gambling, Simmons denied that he had lost any money and told the men that he was no dummy. Simmons, supra , 2011 WL 3118802 at *1.
After hearing this evidence, the jury convicted Simmons of second degree murder and possession of a firearm during the commission of a felony.
C. Direct Appeal
Represented by new counsel, Simmons filed a direct appeal in the Michigan Court of Appeals. He argued that the prosecutor committed misconduct by: 1) referring to statistics about crime in Detroit and urging the jury to convict Simmons to help stem the tide of violence in the city; 2) vouching for Horace Smith's credibility; and 3) denigrating defense counsel's reputation during rebuttal argument. Simmons also claimed that the trial court erred by admitting testimony that he did not express condolences for Bostic's death or attend his funeral. Finally, Simmons argued that the evidence was insufficient to convict.
The state appellate court rejected these claims, vacated a duplicative conviction for second degree murder, and otherwise affirmed the convictions and sentence. Simmons, supra , 2011 WL 3118802 at *1-5. Simmons then sought discretionary review of those same claims in the Michigan Supreme Court, but the court declined to hear the case. People v. Simmons , 490 Mich. 972, 806 N.W.2d 522 (2011).
Simmons did not seek certiorari review in the United States Supreme Court.
D. Federal Habeas Proceedings
On July 31, 2012, Simmons filed a § 2254 petition in this court. (ECF No. 1, PageID 6-7). The petition raised the same three claims that Simmons had raised on direct appeal. (Id. , PageID 3-4).
After the Warden answered the petition and filed the state court record (ECF Nos. 6, 7), Simmons moved on April 9, 2013 for a stay of proceedings while he returned to the Michigan courts to exhaust four additional claims for relief. In support of the motion, Simmons explained that he had recently filed a motion under Michigan Criminal Rule 6.500 for relief from judgment in the state trial court. Judge David Lawson granted the motion to stay and ordered Simmons to file an amended petition within twenty-eight days after the *728 conclusion of the state court proceedings. (ECF No. 10).
1. Return to State Court
Simmons filed his motion for relief from judgment on April 9, 2013.[3] The motion raised four claims:
1. Ineffective assistance of trial counsel based on counsel's failure to conduct an adequate pretrial investigation into (A) Simmons's claim that someone else killed Bostic and (B) an alibi defense based on the testimony of Simmons's mother, brothers, sisters, and girlfriend that he was with them at an all-day family party at the time of the murder;
2. Ineffective assistance of appellate counsel based on the failure to argue that trial counsel had been ineffective;
3. Violation of his speedy trial rights and an inordinate delay between the time of the murder and his arrest; and
4. Improper admission of Simmons's statements to Bostic's mother.
(ECF No. 17-2).
In support of his trial counsel claim, Simmons submitted affidavits from his mother, three sisters, brother, and girlfriend, all of whom averred that Simmons was with them at an all-day family party on June 28, 2006. (Id. , PageID 1812-22). The witnesses added that this day was particularly memorable to them, as it was the day of the Detroit-Windsor International Fireworks Show. Simmons also submitted his own affidavit stating that he had advised counsel about this alibi and the supporting witnesses, and that counsel refused to investigate the defense. (ECF No. 17-2, PageID 1805).
The state trial court denied the motion, concluding that Simmons could have raised his claims on direct appeal and that he did not show "good cause" for that failure and "actual prejudice," as Michigan Court Rule 6.508(D)(3) required. (ECF No. 17 -3, PageID 1834-35). Simmons sought reconsideration of that decision, but the trial court adhered to its original decision. (ECF No. 17 -4; ECF No. 17-6).
Simmons then moved for leave to file a delayed appeal in the Michigan Court of Appeals, seeking to press the same claims he had raised in his motion for relief from judgment. (ECF No. 17-7). The state appellate court denied the application because Simmons "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (Id. , Page ID 1854).
The Michigan Supreme Court denied Simmons's ensuing application for leave to appeal on June 30, 2015. (ECF No. 17-8).
2. Amended § 2254 Petition
In compliance with Judge Lawson's order, Simmons filed an amended habeas petition on July 22, 2015. (ECF No. 13, PageID 1363). The amended petition raised the three claims in Simmons's original petition and the four claims that Simmons raised in his motion for relief from judgment.
Simmons moved in March, 2016 to expand the record and for an evidentiary hearing. (ECF No. 22). He alleged that the state courts denied him a full and fair *729 hearing with respect to an affidavit he had obtained from Horace Smith that contradicted Smith's trial testimony. (Id. , PageID 2106). Besides the affidavit, Simmons also attached a report from a private investigator who interviewed Smith in 2015. (Id. , PageID 2109-12). Smith told the investigator that a Sergeant Clark showed him a picture of Simmons as they drove to the police station. (Id. , PageID 2110).
Judge Lawson denied the motion, concluding that the only issue before was "whether the state courts unreasonably determined any facts relating to the testimony of the witness in question or the circumstances in which he purported to identify the petitioner either before or at trial." (ECF No. 26, PageID 2120). Judge Lawson added that 28 U.S.C. § 2254(d) restricted his review of the case "to the record before the state court." (Id. , PageID 2121).[4]
In March, 2016, Judge Lawson appointed the federal public defender to represent Simmons (ECF Nos. 23, 25), and counsel filed a reply to the Warden's answer to the amended petition. (ECF No. 28).
In August, 2018, following the recusal of Judge Lawson and all Judges of this District, Chief Judge Cole appointed me to sit by designation and adjudicate this case. (ECF No. 29).[5]
Discussion
A. Claim One - Prosecutorial Misconduct
In his first ground for relief, Simmons alleges that the prosecutor committed misconduct in his opening statement, while questioning certain witnesses, and in closing arguments. (ECF No. 13, PageID 1366-68).
The first component of the claim involves the prosecutor's reference to crime statistics and the fact that the "Cold Case Unit" of the Detroit Police Department investigated Bostic's murder.
In his opening statement, the prosecutor mentioned that Bostic's murder case was known as "File 06-223. That means it was the 223rd homicide in the City of Detroit in 2006[.]" (Id. , PageID1366). Then, while questioning the medical examiner, the prosecutor asked her to decode her office's internal file number relating to Bostic's case, ME case number 06-6132. (Id. ). Finally, the prosecutor asked an evidence technician "what portion of his business" involved homicide investigations, to which the technician responded a "greater per portion it" [sic ]. (Id. , Page ID 1366-67).
In the second part of the claim, Simmons alleges that the prosecutor vouched for Horace Smith's credibility. (Id. , PageID 1367). He supposedly did so, Simmons maintains, by telling the jury during his closing and rebuttal that Smith "had nothing to gain and everything to lose" by testifying. (Id. ).
The Warden argues that this claim is procedurally defaulted because Simmons failed to object to the alleged misconduct at trial, and because the state appellate court relied on that failure to reject the claim. (ECF No. 16, PageID 1652). In the *730 alternative, the Warden argues that habeas relief is unavailable because the state court's decision rejecting the claim was not unreasonable. (Id. , PageID 1654 -56).
1. The Claim Is Not Defaulted
Before seeking federal habeas relief, a state prisoner must fairly present his claims to the state courts during a complete round of appellate review. O'Sullivan v. Boerckel , 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). "A habeas petitioner procedurally defaults a claim if: (1) the petitioner failed to comply with a state rule; (2) the state enforced the rule against the petitioner; and (3) the rule is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." Bickham v. Winn , 888 F.3d 248, 251 (6th Cir. 2018).
Michigan law requires "defendants in criminal cases to make their objections before the trial court to preserve them for appellate review." Smith v. Bergh , 2019 WL 415007, *3 (E.D. Mich. 2019).
In this case, however, the state appellate court did not enforce that rule against Simmons. Rather, it made the general observation that "[u]npreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." Simmons, supra , 2011 WL 3118802 at *1. It did not go on to find that Simmons in fact failed to preserve any of his prosecutorial misconduct claims for appellate review, nor did it make any further references to "plain error" or "substantial rights." Id. at *1-2. Instead the court seemingly addressed the merits by holding that none of the prosecutor's statements was "improper."
Because the state appellate court did not rely on Simmons's failure to object at trial when it disposed of the prosecutorial misconduct claim, the claim is not defaulted. Cf. Smith, supra , 2019 WL 415007 at *3 (claim was procedurally defaulted because state appellate court held that the "defendant did not raise this issue at trial").
2. The State Court Reasonably Rejected the Claim
The Michigan Court of Appeals rejected Simmons's misconduct claim on the ground that none of the challenged questions or comments was improper. Because the state court adjudicated the claim on the merits, the claim is subject to the relitigation bar in 28 U.S.C. § 2254(d).
a. The Relitigation Bar
The habeas corpus statute "bars relitigation" of those claims a state court adjudicated on the merits, unless the "state court's decision was contrary to federal law then clearly established in the holdings of" the United States Supreme Court, "involved an unreasonable application of such law," or "was based on an unreasonable determination of the facts." Harrington v. Richter , 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ; 28 U.S.C. § 2254(d).
A state court's decision is "contrary to" clearly established federal law only if the court "applies a rule that contradicts the governing law set forth in [Supreme] Court cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives" at a different result. Williams v. Taylor , 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's application of the governing legal rule is unreasonable when the court "err[s] so transparently that no fairminded jurist could agree with the court's decision." Bobby v. Dixon , 565 U.S. 23, 24, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011).
b. The State Court Reasonably Concluded that the Challenged Comments Were Proper
The Michigan Court of Appeals rejected the prosecutorial misconduct claim on the *731 ground that none of the challenged comments or questions was improper:
Defendant asserts that the prosecutor on three separate occasions referenced crime statistics and that, by doing so, the prosecutor urged the jury to convict defendant in order to help stop the senseless violence in Detroit. A prosecutor may not argue that jurors should convict a defendant as part of their civic duty. People v. Cox , 268 Mich. App. 440, 452, 709 N.W.2d 152 (2005). A civic duty argument is improper because it appeals to the fears and prejudices of the jurors, thereby injecting issues broader than the defendant's guilt or innocence into trial. People v. McGhee , 268 Mich. App. 600, 636, 709 N.W.2d 595 (2005).
First, during opening argument, the prosecutor informed the jury that after the Cold Case Squad was formed in 2009, one of the first cases reviewed by the squad was Elmon's killing. The prosecutor then stated, "And it[ ] [Elmon's case is] known as Detroit Police/Homicide file 06-223. That means it was the 223rd homicide in the City of Detroit in 2006 on June the 28th." When read in context, the prosecutor's statement was part of an explanation for the almost four-year span between Elmon's killing and trial. Moreover, the prosecutor did not use the fact that there were at least 223 homicides in Detroit in 2006 as a basis for convicting defendant. After making the comment, the prosecutor summarized the evidence that he would introduce to establish defendant's guilt. The prosecutor's comment was not improper.
Second, during examination of Dr. Cheryl Loewe, the deputy chief medical examiner, the prosecutor asked Loewe if she had brought with her a file known in the medical examiner's office as case number 06-6132. Loewe replied that she had the file with her. She explained the case number: "That's a number assigned by the medical examiner, and '06 would refer to the year 2006, and 6132 would represent a case number assigned to the decedent not necessarily in sequence of death calls or cases brought into their work." Contrary to defendant's assertion, the number 6132 has no "shock value." Based on Loewe's testimony, the number has no direct relation to any crime statistics or to the senseless violence in Detroit. We find nothing improper in the prosecutor's question to Loewe.
Third, the prosecutor asked Officer Donald Rem, an evidence technician called to the scene of Elmon's killing, what percentage of his "business is homicide." Rem responded, "Greater per portion of it." The question was asked by the prosecutor as part of an exchange in establishing Rem's training and credentials as an evidence technician. The question, under any fair reading, cannot be construed as an argument for the jury to convict defendant as part of their civic duty. The prosecutor's question to Rem was not improper.
Defendant next asserts that the prosecutor vouched for the credibility of Lewis [sic ]. A prosecutor may not vouch for the credibility of a witness by suggesting that he has special knowledge of the witness's truthfulness. People v. Seals , 285 Mich. App. 1, 22, 776 N.W.2d 314 (2009). A prosecutor may, however, argue from the facts that a witness is credible. Id.
The prosecutor argued to the jury that Smith had "absolutely nothing to gain, [and] everything to lose" in testifying. He further submitted that Smith was "a person of good credibility and that his testimony should be acceptable." Read in context, the prosecutor's argument to the jury did not constitute improper vouching for Smith's credibility. The prosecutor's argument did not convey a *732 message that he had some special knowledge or facts indicating that Smith was credible. People v. Bahoda , 448 Mich. 261, 277, 531 N.W.2d 659 (1995). Rather, the prosecutor argued that, based on the evidence, Smith could be believed because he had nothing to gain from testifying-he had no connection to Elmon or Nita-but everything to lose-because "people" would now know him. The prosecutor's argument to the jury concerning the credibility of Smith was not improper.
Simmons, supra , 2011 WL 3118802 at *2-3.
Based on my review of the trial transcripts and the state court's decision, I find that the Michigan appellate court's decision was neither contrary to, nor an unreasonable application of, Darden v. Wainwright , 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), which governs prosecutorial misconduct claims. See generally Majid v. Noble , 751 F. App'x 735, 743-45, 2018 WL 5008554, *6-7 (6th Cir. 2018).
Far from being, as Simmons would have it, the basis of an argument that the jury had a civic duty to convict Simmons, given the "senseless violence" and carnage in Detroit, the prosecutor's comments and questions simply provided useful background information about the case and a witness's qualifications to testify.
As the state court observed, nearly four years had passed between Bostic's murder and Simmons's trial. In those circumstances, the prosecutor's references to the Cold Case Unit and the meaning of certain case file numbers might have assisted the jury's understanding of why that delay existed and how authorities had tried to handle the case. Likewise, the reference to what percentage of Rem's work involved homicide investigation went only to show that he was a qualified, experienced investigator.
Finally, the state court permissibly concluded that there was no improper vouching for Smith's credibility. The prosecutor argued that the facts of the case would show, and did show, that Smith's identification was reliable, given his disinterested status and the unappetizing prospect of being a witness in a murder trial - a theme that several witnesses invoked during trial.
Thus, again on the merits, I find nothing improper in the prosecutor's challenged conduct. In any event, it was not unreasonable for the state court to so conclude. Simmons is not entitled to habeas relief on his first claim.
B. Claim Two - Admission of Inflammatory and Irrelevant Evidence
Simmons next claims that the trial court violated his right to a fair trial by admitting testimony that he neither expressed condolences for Bostic's death nor attended his funeral. (ECF No. 13, PageID 1368-69).
The Warden argues that this claim is partly defaulted because the state appellate court held that Simmons failed to object to the testimony on the ground that it was unduly prejudicial (he objected only that it was irrelevant). (ECF No. 16, PageID 1658 -59); see Simmons , 2011 WL 3118802 at *4. He then argues that the state court reasonably concluded that the evidence was both relevant and not unfairly prejudicial.
On direct appeal, the state appellate court held that this claim was forfeited in part and meritless in its entirety:
We review a trial court's evidentiary decisions for an abuse of discretion. Unger , 278 Mich. App. at 216 [749 N.W.2d 272]. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes.
*733 Id. at 217 [749 N.W.2d 272]. Although defendant objected to the testimony of Nita and McCoy on grounds of relevancy, he did not object on grounds that the testimony was unfairly prejudicial. An objection based on one ground is insufficient to preserve appellate review on a different ground. People v. Stimage , 202 Mich. App. 28, 30, 507 N.W.2d 778 (1993). We review unpreserved claims of evidentiary error for plain error. People v. Coy , 258 Mich. App. 1, 12, 669 N.W.2d 831 (2003).
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. It is generally admissible. MRE 402 ; People v. Roper , 286 Mich. App. 77, 91, 777 N.W.2d 483 (2009). Here, Nita testified that soon after she learned of Elmon's murder she contacted defendant to ask him what had happened to Elmon and the speakers. According to Nita, defendant replied that he did not know what happened to Elmon and that he had sold the speakers for $ 200. When Nita told defendant that she needed Elmon's share of the money because she needed money to bury Elmon, defendant stated that he would call her back. Nita testified that [defendant] never expressed any condolences for Elmon's death, nor did he ever call her back. McCoy testified that he attended Elmon's funeral, but that defendant did not. While the testimony that defendant did not express any condolences to Nita and did not attend Elmon's funeral was not direct evidence of guilt, the testimony has a tendency to make it more probable that defendant was the person who killed Elmon. MRE 401. The evidence may have indicated defendant's consciousness of guilt. Accordingly, the trial court did not abuse its discretion in concluding that the testimony of Nita and McCoy was relevant.
Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. All relevant evidence is prejudicial to some extent. People v. Murphy (On Remand), 282 Mich. App. 571, 582, 766 N.W.2d 303 (2009). It is only evidence that is unfairly prejudicial that should be excluded. McGhee , 268 Mich. App. at 613-614 [709 N.W.2d 595]. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." People v. Blackston , 481 Mich. 451, 462, 751 N.W.2d 408 (2008). Here, nothing in the record indicates that the jury would give undue or preemptive weight to the testimony of Nita or McCoy or that it would be inequitable for the jury to consider the testimony. Accordingly, the testimony of Nita and McCoy was properly admitted.
Simmons, supra , 2011 WL 3118802 at *4.
1. The State Court Reasonably Held that the Evidence Was Relevant
For two reasons, Simmons cannot prevail on the relevance component of his due process claim.
First, "the Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of relevant evidence, no matter how prejudicial, amounted to a violation of due process." Blackmon v. Booker , 696 F.3d 536, 551 (6th Cir. 2012). In light of the state court's predicate finding that the testimony was relevant, and the absence of any clearly established Federal law on point, section 2254(d) blocks further litigation of the irrelevant evidence claim.
*734 Second, and in any event, the state appellate court reasonably held that the evidence was relevant.
"[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." Seymour v. Walker , 224 F.3d 542, 552 (6th Cir. 2000). Indeed, "state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id.
Simmons's claim cannot get past this high bar. As the state court reasonably explained, the evidence that he did not express condolences to Nita Bostic for the death of her son (and his friend) or attend Bostic's funeral has a tendency to show, however slightly, a consciousness of guilt. This is especially true if one considers that evidence alongside, inter alia , Nita Bostic's testimony that Simmons never gave her Bostic's share of the proceeds from the alleged speakers sale, which she had told Simmons she needed to bury her son.
For these reasons, the state appellate court's holding that the evidence was relevant was reasonable.
2. The Evidence Was Not Unduly Prejudicial
Although the Warden argues, correctly, that Simmons's claim is defaulted to the extent that he challenges the prejudicial nature of the evidence, I will bypass the default issue and proceed directly to the merits.
This is principally because the claim fails under even the standard of review most favorable to Simmons. I so proceed also because I could not resolve the default question without deciding if Simmons's innocence claim could excuse the default, an issue as to which I need to conduct further proceedings. I also bypass whether I should review the claim under § 2254(d) or de novo under 28 U.S.C. § 2254(a), as the claim fails even under the latter standard. Cf. Berghuis v. Thompkins , 560 U.S. 370, 390, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).
For largely the same reasons that the state court found the evidence to be relevant, I find that it was not so unduly prejudicial that it denied Simmons a fair trial.
Simmons's lack of condolences and his absence from Bostic's funeral were, moreover, but a small piece of the prosecution's case. What the case hinged on was Simmons's alleged motive to kill Bostic, the evidence that he was present with Bostic shortly before the murder, and, most importantly, Smith's identification of Simmons as the man he first saw with the gun whom he then saw driving away from the crime scene. Simmons has simply not demonstrated, whether in state court or in this court, how Nita Bostic's and Desmond McCoy's testimony could have so affected the jury as to make it impossible for them to decide the case fairly and impartially.
Simmons is not entitled to habeas relief on his second claim.
C. Claim Three - Sufficiency of the Evidence
For his third claim, Simmons alleges that the evidence was insufficient to prove him guilty of second degree murder beyond a reasonable doubt. The Michigan Court of Appeals rejected that claim, holding that the circumstantial evidence and the reasonable inferences it permitted the jury to draw were sufficient to convict:
We review de novo a challenge to the sufficiency of the evidence. People v. Cline , 276 Mich. App. 634, 642, 741 N.W.2d 563 (2007). We view the evidence in the light most favorable to the *735 prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. Id. The credibility of the witnesses and the weight to be accorded to evidence are questions for the jury, People v. Harrison , 283 Mich. App. 374, 378, 768 N.W.2d 98 (2009), and this Court will not interfere with the jury's determinations, People v. Williams , 268 Mich. App. 416, 419, 707 N.W.2d 624 (2005). Circumstantial evidence and reasonable inferences arising therefrom can constitute satisfactory proof of the elements of the crime. Id.
In this case, Elmon was in defendant's company the morning of his killing. He and defendant played dice at Keith's house, and Elmon won defendant's money, speakers, and gun. The gun, according to Keith, was a .38 caliber. Defendant was upset with Elmon. He accused Elmon of cheating, but stated that he would "get everything back." Less than two hours after Elmon and defendant left Keith's house, Elmon was dead. The forensic firearms examiner testified that the bullets that killed Elmon were consistent with .38 caliber bullets. In addition, minutes after hearing gunshots, Allison saw an African-American male driving a blue Crown Victoria, the same model car defendant was driving earlier that morning and the night before, west on Longview Street. Smith, after he heard the gunshots, saw an African-American male run past St. Julian's Church Elementary School to a car. The car, which he identified as a Crown Victoria, went past him as he stood at the street edge. He identified defendant as the driver. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant killed Elmon.
Simmons, supra , 2011 WL 3118802 at *5.
This decision neither was contrary to, nor an unreasonable application of, Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The only disputed issue was the identify of Bostic's killer. Simmons and Bostic were together the night before and the morning of the murder. Having lost several hundred dollars and valuable property to Bostic, Simmons was upset and vowed to get everything back. Two witnesses saw a blue Crown Victoria or Grand Marquise leaving the scene of the crime, and this was the kind of car Simmons was driving when he and Bostic went to Bostic's mother's home the night before the crime and to Pasua Keith's house hours before the murder. And, most importantly, Horace Smith identified Simmons as the man he had seen with a gun leaving the scene.
The state court's decision that this evidence sufficed to prove Simmons guilty beyond a reasonable doubt was reasonable, and habeas relief is unavailable. Cf. Coleman v. Johnson , 566 U.S. 650, 651, 132 S.Ct. 2060, 182 L.Ed.2d 978 (2012) (" Jackson claims face a high bar in federal habeas proceedings").
D. Claim Six - Speedy Trial and Delayed Arrest[6]
In his sixth ground, Simmons claims that "there was an Inordinate Delay in Arrest, which impeded his Constitutional *736 guarantee to a Speedy Trial." (ECF No. 13, PageID 1376).
Simmons alleges that the Detroit Police Department and the Wayne County Prosecutor's Office unreasonably delayed in apprehending and prosecuting him, with the intent to obstruct his ability to defend against the charges. (Id. ). According to Simmons, the investigation into Bostic's murder had "centered" on him since July, 2006. (Id. ). He notes that a police officer interviewed him about the murder in August, 2006. (Id. ). He also alleges that the police seized his sister's car - a blue Crown Victoria - sometime after the murder and searched it, without success, for incriminating evidence. (Id. ). In light of all this, Simmons maintains, it was unreasonable for the police not to arrest him until 2009.
Finally, Simmons claims a violation of his speedy trial rights based on the nearly five month delay between the issuance of the felony complaint against him, on November 1, 2009, and the start of his trial, on March 21, 2010. (ECF No. 16, PageID 1700).
1. Pre-Arrest Delay
Before a suspect is arrested or charged, "due-process rights protect against oppressive delay." U.S. v. Brown , 498 F.3d 523, 527 (6th Cir. 2007).
"[T]he applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges." U.S. v. Marion , 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). But because the limitations period:
does not fully define [a person's] rights with respect to the events occurring prior to indictment ... due-process protections would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [the defendant's] right[ ] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.
Brown, supra , 498 F.3d at 528 (internal quotation marks omitted).
The petition fails to establish that the delay between Bostic's murder and Simmons's arrest and indictment either caused prejudice or was "an intentional device" that the prosecutor devised to put Simmons at a tactical disadvantage.
On the contrary, the trial testimony shows that the investigation into Bostic's murder stalled despite what appeared to be the Detroit Police Department's best efforts to identify a suspect. (ECF No. 16, PageID 1697-99) (Warden's answer summarizing relevant trial testimony detailing the course of the investigation). The investigation included, moreover, an interview with Simmons in August, 2006, and an interview with Horace Smith in October, 2006. Yet, for reasons that are unclear, Smith did not identify Simmons until late 2009.
Simmons offers only speculation to support his claim that police and prosecutors knew that he was the murderer, but manufactured the delay to prejudice his ability to defend himself.
He contends, for instance, that the police's alleged seizure of his sister's car, and the ensuing failure to recover incriminating evidence while searching the car, shows that the police long considered him a suspect. But if it is true, as Simmons claims, that the police failed to find anything incriminating during that search, that would be but one reason the police did not have probable cause for an arrest until much later, when Smith finally identified Simmons.
In any event, a review of the trial transcripts tends to show that defense counsel was able to use the delay to undermine the *737 prosecution's case in general, and Smith's identification of Simmons in particular.
Counsel made effective arguments to the jury about the witnesses' arguably surprising ability to remember, nearly four years later, the day of the murder - June 28, 2006 - and all that had happened to them that day, even though none of the witnesses had found out about Bostic's murder until several days later or could say why that day stood out in their memories.
Counsel also tried to capitalize on Smith's failure to come forward immediately after the shooting and his inability to locate either a piece of paper or a nail box on which he had allegedly scrawled the license plate of the car he had seen leaving the area. Counsel also highlighted the contrast between Smith's trial testimony, where he was 100 percent certain of his identification, and an earlier deposition he gave to the prosecutor, where he was only eighty percent certain that Simmons was the man he had seen. (ECF No. 7-8, PageID 970-75).
While the delay was not necessarily an advantage for the defense, neither did it prejudice Simmons. He is not entitled to habeas relief on this claim even under de novo review.
2. Speedy Trial
"The Sixth Amendment guarantees a defendant the right to a speedy trial, which involves a fact-intensive inquiry requiring the balancing of (1) whether [the] delay before trial was uncommonly long; (2) whether the government or the criminal defendant is more to blame for the delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether he suffered prejudice as the delay's result." Foster v. Warden, Lebanon Corr. Inst. , 2011 WL 7552411, *6 (S.D. Ohio 2011) (citations and internal quotation marks omitted).
The warrant for Simmons's arrest and the felony complaint both issued on November 1, 2009, and the trial began not quite five months later, on March 22, 2010.
The Sixth Circuit has held that an even longer delay, of eight months, is not presumptively prejudicial. Norris v. Schotten , 146 F.3d 314, 328 (6th Cir. 1998) ; see also Foster, supra , 2011 WL 7552411 at *7 (177-day delay not presumptively prejudicial). Because the delay was not presumptively prejudicial, Simmons's speedy trial claim has no merit, and I need not consider the remaining factors under Barker v. Wingo , 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Wilson v. Mitchell , 250 F.3d 388, 394 (6th Cir. 2001).
E. Claim Seven - Admission of Hearsay Evidence
Simmons's seventh claim alleges that the trial court erred when it allowed Nita Bostic to testify to statements that Simmons made to her during a phone conversation. (ECF No. 13, PageID 1378).
After learning that her son had been killed, Nita testified, she called Simmons and asked him what had happened to Elmon. (ECF No. 7-5, PageID 511-12).
Before she could answer, defense counsel objected that Nita could not relay Simmons's responses unless she could provide a verbatim account of what Simmons had said, as opposed to a mere summary of his words. (Id. , PageID 513-15). Outside the jury's presence, Nita recounted Simmons's statements to her and testified that "that's exactly what [Simmons] told me." (Id. , PageID 517). The trial court therefore overruled the objection and permitted Nita to testify that Simmons told her: 1) "I haven't seen Elmon and I don't know what happened to him"; 2) he had sold the speakers he and Elmon had for $ 200; and 3) he would call Nita back about giving her Elmon's share of the $ 200 he got for the speakers. (Id. , PageID 519 -20).
*738 The admission of this testimony provides no basis for relief.
First, there is no federal constitutional requirement that a witness must provide a "verbatim" account of a defendant's out of court statements before she may testify to those statements. Second, and in any event, Nita testified that she recounted "exactly" what Simmons had told her, and so her testimony would have been admissible even under the rule that Simmons advocates for.
Finally, there is no merit to Simmons's related claim that trial counsel was ineffective for not blocking admission of this testimony. (ECF No. 13, PageID 1378-79).
Most simply put, defense counsel made his objection, and the trial court overruled him. That defense counsel apparently failed to follow up on his representation to the trial court that he would provide case law supporting his objection is irrelevant: there was no merit to his objection, whether under Michigan law or federal law, and Simmons has yet to cite any decision, whether from Michigan or another jurisdiction, that would have supported his objection to Bostic's testimony. Accordingly, Simmons is not entitled to relief on his seventh claim.
F. Claims Four and Five - Ineffective Assistance of Trial and Appellate Counsel
In his fourth ground for relief, Simmons argues that trial counsel was ineffective for failing to conduct an adequate investigation into: 1) his claim that someone else had killed Bostic; and 2) an alibi defense based on his family members' testimony that Simmons was at a family party at the time of Bostic's murder.
His fifth ground for relief is closely related, alleging that appellate counsel was ineffective for not challenging trial counsel's ineffectiveness on direct appeal.[7]
The Warden argues that these claims are untimely, procedurally defaulted, barred under § 2254(d), and meritless even under de novo review. As I explain below, I agree that the claims are time-barred, but I conclude that further proceedings are needed to determine whether Simmons's innocence claim should excuse his untimely filing.
Although I was able to dispose of Simmons's other untimely claims on the merits, the ineffective assistance claims are not so insubstantial that I can bypass the Warden's timeliness defenses and deny them on the merits.
On the contrary, Simmons presented the state courts, and has presented this court, with affidavits establishing that trial counsel knew about an alibi defense supported by multiple witnesses whose testimony, if believed by the jury, would have made it impossible for Simmons to have killed Bostic. He also presented evidence, in the form of his own affidavit and those of his family members, establishing that trial counsel did not contact the witnesses or otherwise investigate the alibi defense.
Nevertheless, the state courts denied relief, either on procedural grounds or on the merits. (ECF No. 16, PageID 1662-66, 1667-69) (Warden's arguments that state courts denied relief on procedural grounds and on the merits).
*739 Without expressing any view on Simmons's entitlement to habeas relief on these claims, I note that similar failures by defense counsel in handling alibi defenses - particularly the failure even to speak with the alibi witnesses - can result in a grant of the writ. E.g., Towns v. Smith , 395 F.3d 251, 259-60 (6th Cir. 2005) ; Stewart v. Wolfenbarger , 468 F.3d 338, 356-61 (6th Cir. 2006) ; Avery v. Prelesnik , 548 F.3d 434, 437-39 (6th Cir. 2008)
Given the facial plausibility of Simmons's Strickland claims, and the many unresolved factual issues concerning his actual innocence claim, I will permit the parties to develop the record undergirding Simmons's innocence claim and then hold an evidentiary hearing on that issue. Dinwiddie v. Woods , 2017 WL 1543679, *5 (E.D. Mich. 2017) (whether to hold a hearing on petitioner's actual innocence claim "falls within the discretion of the Court").
1. Timeliness
Simmons did not raise his ineffective assistance claims in this court until July 22, 2015, when he filed his amended petition. The Warden argues, and Simmons concedes (ECF No. 28, PageID 2128), that these claims are untimely.
Simmons's judgment of conviction became final on March 27, 2012, when the time to file a certiorari petition expired. Jimenez v. Quarterman , 555 U.S. 113, 119, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009). He then had until March 27, 2013, to file his petition. Simmons's original petition, filed in July, 2012, was therefore timely.
However, the filing of a federal habeas petition does not toll the limitations period; rather, the period continues to run post-filing until the one-year clock is up. Duncan v. Walker , 533 U.S. 167, 181-82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). Because the limitations period expired on March 27, 2013, the motion for relief from judgment that Simmons filed in state court five days later, on April 1, 2013, did not toll the limitations period. Wilson v. Lasatz , 2019 WL 462972, *2 (E.D. Mich. 2019).
Accordingly, the amended petition, filed on July 22, 2015, is untimely unless it relates back to the original petition.
To be sure, the first three claims, raised in both the original and amended filings, relate back and thus are timely. Claims four and five, however, "differ in time and type" from the claims in the original petition, Mayle v. Felix , 545 U.S. 644, 650, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005), and thus are time-barred. Indeed, they have nothing at all to do with the original timely claims involving prosecutorial misconduct, sufficiency of the evidence, or the admission of the consciousness-of-guilt evidence from Bostic's mother and Desmond McCoy.
2. Equitable Tolling
The limitations period in 28 U.S.C. § 2244(d)(1) is subject to equitable tolling.
To obtain such tolling, Simmons needs to show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida , 560 U.S. 631, 649, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010).
Simmons makes a convincing case that he pursued his rights diligently (ECF No. 28, PageID 2128-29, 2140-42), but he has not established, much less argued, that some extraordinary circumstance prevented him from filing his ineffective assistance claims on time. (Id. , PageID 2125-42). Equitable tolling is therefore unavailable.
3. Actual Innocence
"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations."
*740 McQuiggin, supra , 569 U.S. at 386, 133 S.Ct. 1924.
"But this innocence gateway is a narrow one. The Supreme Court has cautioned that it should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Davis v. Bradshaw , 900 F.3d 315, 326 (6th Cir. 2018).
"The touchstone of the inquiry is whether a petitioner's new evidence shows it is more likely than not that no reasonable juror would have convicted him." Eberle v. Warden, Mansfield Corr. Inst. , 532 F. App'x 605, 613 (6th Cir. 2013).
To make out a credible innocence claim, the petitioner must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." Schlup v. Delo , 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).
"Because a gateway-innocence claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." Davis, supra , 900 F.3d at 326.
In doing so, I "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell , 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). I must then make a "probabilistic determination about what reasonable, properly instructed jurors would do." Id.
a. Simmons's Claim
Simmons's actual innocence claim has three components
The first is Simmons's alibi. To support that claim, Simmons has submitted affidavits from: 1) his sisters Nakiya Mitchell, Sa'keenah Simmons, Yulanda Mitchell (and her boyfriend); 2) his brother Derek Mitchell; 3) his mother Gloria Mitchell and his stepfather Carl Johnson; 4) his then-girlfriend Brittany Chavous; and 5) a woman named Tracie McElroy.
The gist of these affidavits is that Simmons was present at an all-day family party, which took place at his sister Sa'keenah Simmons's apartment, at the time Bostic was killed. These witnesses state that the day of Bostic's murder - June 28, 2006 - was memorable to them because it was the date of the Detroit-Windsor international fireworks show, when many families have such all-day parties. Additionally, Nakiya Mitchell would have testified that she owned a blue Crown Victoria, that she lent it to Simmons, but that he returned it to her around 10:45 a.m. on June 28.
Simmons alleges that he told trial counsel about these witnesses and the alibi they could have provided. Nevertheless, Simmons claims, trial counsel refused to interview them. For their part, the witnesses say that, had trial counsel contacted them, they would have told counsel that they were willing to testify for Simmons that he was present at the family party at the time Bostic was murdered.
The second component is an affidavit from Horace Smith.
In contrast to his trial testimony, Smith swears in his affidavit that the police officer escorting him to the station to view the line-up showed him a picture of a light-skinned African-American man (i.e., Simmons). (Doc. 13-2, PageID 1597). Smith *741 then states that he recognized Simmons from that photo during the actual line-up procedure. (Id. ). However, Smith never says that Simmons was not the man he saw near the crime scene after the shooting.
On this score, Simmons has also submitted an affidavit from a man named Cordell Lowe.
Lowe, whose relationship to Simmons or Smith is unclear, states that Smith told him that police officers showed him at least two photo lineups before he viewed the in-person lineup, and that Simmons was the only light-skinned African-American in both of the photo lineups. Lowe also claims to have an audio recording of his conversation with Smith.
Finally, Simmons has offered a theory as to who the real killer might be.
Simmons claims that, on either the night before or the morning of the murder, he agreed to help Bostic steal a car. He insists, however, that it was Bostic who stripped the car and was eager to sell the stolen parts to a third party.
Simmons then claims that a man named Peanut, who was Pasua Keith's boyfriend, was present at Keith's house with him and Bostic. Keith and Peanut allegedly helped Bostic find someone to whom to sell the car's speakers. At some point, the owner of the stolen car learned that Bostic was responsible for stealing his car; he then posed as the interested buyer and killed Bostic.
As far as I can tell, however, Simmons offers no evidence - other than his own subjective beliefs - to support this "other killer" theory.
b. Warden's Response
The Warden argues that Simmons's innocence claim is implausible and subject to summary rejection.
i. Alibi Evidence
He first contends that I cannot consider the alibi evidence at all because it was known to Simmons at trial, and thus does not qualify as "new evidence" for purposes of the innocence exception. (ECF No. 16, PageID 1648).
This argument rests on an incorrect premise. For purposes of the innocence exception, evidence is "new" as long as it was not presented at trial. As the Supreme Court explained in Schlup, supra , 513 U.S. at 324, 115 S.Ct. 851, an innocence claim is credible only if the petitioner can "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial ." (Emphasis supplied). The Warden cites no authority suggesting otherwise. (ECF No. 16, PageID 1648).
The Warden also argues that the timing of the alibi defense makes it incredible. He points out that the defense did not emerge until 2012, some two years after the trial. He contends that, if Simmons really had been at the family party, he and his relatives would have been "scream[ing] that defense from the rooftops." (Id. , PageID 1649).
To be sure, "[a] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." McQuiggin, supra , 569 U.S. at 385, 133 S.Ct. 1924.
While the Warden's argument about delayed assertion of the alibi is not entirely without force, the delay is not, standing alone, sufficient to reject Simmons's innocence claim.
*742 For one thing, Simmons's mother filed a grievance against trial counsel immediately after the trial. (ECF No. 13-1, PageID 1455). One of her complaints was that "none of [Simmons's] evidence or witness[es] were submitted on his behalf. Which the attorney had knowledge of. Evidence that would have clearly excluded Paul Simmons from the scene." (Id. ).[8] These allegations, though lacking in specifics, are consistent with Simmons's claim that he told counsel about the alibi witnesses but counsel failed or refused to contact them.
For another, Simmons's claim that counsel refused to interview his family members or otherwise pursue the alibi defense would, if proved, explain, to a significant degree, the delay in bringing that evidence forward. After all, a criminal defendant must of necessity rely on his attorney to evaluate the case against him, act on the information that the defendant supplies, and make reasonable strategic choices as to how best to defend the client against those charges. But if counsel unreasonably refuses to investigate a potentially meritorious alibi, such that the alibi surfaces only during collateral review in connection with an ineffective assistance claim, it would be unfair to hold that delay entirely against the defendant.
Finally, Simmons's current attorney has made a convincing argument that Simmons acted diligently from his prison cell to gather all of the alibi evidence while pursuing both federal habeas relief and the motion for relief from judgment in state court. (Doc. 28, PageID 2141-42).
For these reasons, I cannot discount the alibi evidence out of hand based only on the fact that it emerged in 2012.
ii. The Withdrawn Alibi
The Warden's most substantial argument centers on the withdrawn alibi that would have placed Simmons at work at the time of the murder. He argues that, had Simmons's family members testified that Simmons was with them at a family party on June 28, 2006, the prosecution could have impeached them with evidence that they had previously offered a falsified alibi, thereby permitting the jury to conclude that this alibi, too, was false.
If one or more of Simmons's family members were behind the first alibi, then there is little to no chance that a reasonable juror would accept testimony from those family members about a second alibi for Simmons. Likewise, if defense counsel knew that Simmons's family members had concocted the first alibi, he could have, in all likelihood, reasonably declined to call those witnesses to testify about a different alibi.
But the record does not establish that Simmons or someone close to him forged the paystubs that were at the heart of the withdrawn alibi. Because the state trial court made no factual findings on this issue before trial or during postconviction review, the record does not permit me to determine who created the paystubs or whether that person or persons was or were among Simmons's alibi witnesses. Indeed, Simmons contends that trial counsel forged the paystubs and concocted the withdrawn alibi.
These unresolved factual questions, which go to the heart of Simmons's innocence claim (and, as well, his ineffective assistance claims), simply underscore the need for a hearing.
*743 iii. Smith's Affidavit
With respect to Horace Smith's affidavit, the Warden argues that I should view it with "extreme suspicion" because it recants Smith's trial testimony that no one had showed him any pictures that might have influenced his identification of Simmons. (ECF No. 16, PageID 1703).
I of course accept that post-trial affidavits that recant trial testimony should be treated with skepticism. See, e.g., Mahaffey v. Scutt , 2014 WL 4206947, *4 (E.D. Mich. 2014) (Levy, J.) (citing United States v. Chambers , 944 F.2d 1253, 1264 (6th Cir.1991) ("The new evidence brought forward by petitioner, ... recanting affidavits and witnesses, is viewed with 'extreme suspicion.') ).
But here, Smith was a disinterested witness with no relationship to Simmons or Bostic. Nothing in his affidavit indicates, moreover, that someone pressured him to alter his trial testimony. Indeed, his affidavit does not recant his in-court identification of Simmons as the man he claimed to have seen with a gun leaving the area where Bostic's body was found.
Furthermore, Smith's claim - corroborated by Cordell Lowe's affidavit and, as well, Smith's statements to the private investigator - would, if true, undermine the reliability of his identification of Simmons.
As the prosecutor acknowledged at trial, Smith was "the most important witness in this case." (ECF No. 7 -8, PageID 956). He was the only witness who placed Simmons near the scene of the crime. But Smith did not identify Simmons until more than three years after the crime. At trial, he said that he was one hundred percent certain that Simmons was the man he had seen on the day of the murder, whereas he had previously told the prosecutor he was only eighty percent certain of the identification. He also admitted telling prosecutors that the car he had seen leaving the scene was tan, not blue.
To be sure, the jury knew about these grounds to question the reliability and accuracy of Smith's testimony. But Smith was insistent that the police had not done anything to influence his identification of Simmons - testimony that he has now walked back. While Smith's affidavit would not on its own be sufficient to support an actual innocence claim, it, in combination with the testimony of at least six or seven of Simmons's family members that Simmons was with them at the time of the murder, does support Simmons's claim
iv. Summary
Much remains to be proved in this case, including, inter alia , whether Simmons advised his lawyer of the alibi defense; what investigation, if any, counsel conducted into that defense; whether the alibi witnesses were truthful in their affidavits; whether any of Simmons's alibi witnesses were involved in developing the withdrawn alibi defense; and the exact circumstances surrounding and preceding Smith's identification of Simmons.
All of these considerations go, in my view, to the credibility, and thus the viability, of the innocence claim, and need to be resolved before I can make an informed ruling on the claim. At this juncture, however, the claim is sufficiently compelling that I cannot dispose of it summarily on the briefs alone. Indeed, had the jury heard Simmons's alibi witnesses testify uniformly that Simmons was in their presence at the time of the murder, it may very well have been the case that no rational juror among them would have voted to convict.
Conclusion
It is, therefore,
ORDERED THAT:
1. Simmons's first, second, third, sixth, and seventh grounds for habeas relief *744 be, and the same hereby are, denied with prejudice;
2. I will hold an evidentiary hearing to resolve Simmons's claim that he is actually innocent, such that I may reach the merits of his untimely claims that trial and appellate counsel were ineffective.
3. The Clerk of Court shall forthwith set this case for a telephonic status/scheduling conference.
4. At the status/scheduling conference, counsel should be prepared to discuss what kind of discovery is needed to prepare for the hearing, how the discovery process can be conducted fairly and expeditiously, a schedule for doing so and for the hearing, and any other issues that counsel believe I should be aware of.
5. Counsel should also be prepared to discuss whether the hearing should be expanded to receive evidence as to the merits of Simmons's ineffective assistance claims, in particular as to the performance prong of the claims. In my view, the merits of the Strickland claims overlap to a large extent with the merits of the innocence claim. Because the hearing will be focused on the alibi evidence, it would seem to be an efficient use of resources to use the hearing to learn what trial and appellate counsel knew about the alibi defense, particularly given that trial counsel will be an indispensable witness on the innocence claim. Should I conclude that Simmons's innocence claim excuses his untimely filing, having a complete record regarding trial counsel's handling of the alibi evidence, and appellate counsel's handling of the direct appeal, would avoid the need for a second hearing should I conclude either that I may review the claims under § 2254(a) or that the state court's rejection of the claims was unreasonable. See Sanders v. Curtin , 529 F. App'x 506, 517 (6th Cir. 2013).
So ordered.

Of the United States District Court for the Northern District of Ohio, sitting by designation.

Smith also testified that police officers did not show him any pictures or documents that might have influenced his identification of Simmons. (ECF No. 7-6, PageID 689). Smith has since signed an affidavit stating that one of the homicide detectives who escorted him to the police station to view the lineup showed him a single picture of Simmons before the lineup "and reminded me that I had previously identified this suspect in an earlier photo line-up." (ECF No. 13-2, PageID 1597, ¶ 6).

Simmons signed the motion on April 1, 2013, but Michigan law does not formally recognize a mailbox rule for motions for relief from judgment. Some judges of this district have, however, applied the rule to such motions. E.g., Shaykin v. Romanowski , 2016 WL 193381, *3-5 (E.D. Mich. 2016) (Michelson, J.). Even assuming the rule applied to Simmons's motion, the earliest day on which his motion could be deemed filed would be April 1, 2013, which was the fifth day after the statute of limitations under 28 U.S.C. § 2244(d)(1)(A) expired. Thus, as I explain infra , the motion had no tolling effect under 28 U.S.C. § 2244(d)(2).

This order does not preclude me from holding a hearing on whether Simmons's innocence claim excuses his untimely filing. First, the order was interlocutory and therefore subject to revision at any time before the entry of final judgment. Second, it is clear that Judge Lawson understood Simmons to have requested a freestanding hearing on his innocence claim, one that was unconnected to any other issue (such as timeliness or procedural default) that might have merited a hearing. As I explain below, Simmons's innocence claim is sufficiently plausible that I cannot resolve it without further development of the record.

In her former capacity as a judge of the Wayne County Circuit Court, District Judge Parker presided over Simmons's trial and postconviction proceedings.

The Warden argues that both this claim and Simmons's seventh claim are untimely, procedurally defaulted, barred by § 2254(d), and meritless under de novo review. Given my conclusion that these claims are so patently without merit as to fail under even de novo review, I will bypass the procedural objections and the question whether these claims are subject to § 2254(d), see Berghuis, supra , 560 U.S. at 390, 130 S.Ct. 2250, and simply address them under § 2254(a).

Michigan law permits a defendant to raise a claim of trial counsel's ineffectiveness on direct appeal. If the factual basis for the claim is not apparent from the record, then the defendant may request a Ginther hearing. Under that procedure, the appellate court can remand the case to the trial court to develop the facts surrounding the ineffective assistance claim. Ceasor v. Ocwieja , 655 F. App'x 263, 271 (6th Cir. 2016). Here, Simmons alleges that his appellate counsel should have requested a Ginther hearing after Simmons told him about trial counsel's mishandling of the alibi defense. (ECF No. 13, PageID 1375).

The record before me is silent as to whether this complaint precipitated an investigation into counsel's conduct and the outcome of any such investigation.